# JUNE TERM, 1910.*

---

## PEOPLE v. STEWART.

1. CRIMINAL LAW—EVIDENCE—OPINION—IDENTIFICATION—TRIAL.
   Prejudicial error does not result from permitting a witness to give his opinion that a person whom he saw on the night the alleged crime was committed was respondent, and afterwards striking it out on discovering, from further examination, that he had no sufficient basis for the opinion.

2. SAME—ARSON—IDENTITY OF RESPONDENT.
   It was not error to submit the case to the jury under evidence that respondent, charged with arson, alighted from a car just before the fire, near the place of it, and that the conductor of the car knew her, and that she got on another car about two hours later, and subsequently denied, to the sheriff, having alighted from the car at the point described.

3. SAME—IDENTITY—EVIDENCE.
   Identity is not necessarily to be proved by direct evidence, but may be established by circumstances pointing to one person.

4. SAME.
   That conflicting testimony as to the time of the fire was introduced, a part of which, given by respondent's witnesses, tended to show that she could not have set the fire in the time which she had, did not require the direction of a verdict.

5. TRIAL—ARGUMENT—CRIMINAL LAW—ARSON.
   While it was reprehensible for the prosecuting attorney to state, in his argument, that it is common knowledge that people burn buildings for insurance, no prejudice can be held to have resulted, in view of the fact that the court instructed the jury to ignore the statement. HOOKER and MOORE, JJ., dissenting from the conclusion that the argument was improper.

6. ARSON—VARIANCE—INFORMATION.
   Although the information charged respondent with setting fire to three buildings, she might properly be convicted of the offense if the proofs showed that she set fire to one of them.

---

* Continued from Vol. 162.

7. SAME—IDENTITY—EVIDENCE.
   *Held* that the testimony of the conductor of a car, who identified respondent, was for the jury.

8. NEW TRIAL — CRIMINAL LAW — VERDICT — AFFIDAVITS OF JURORS.
   On motion for a new trial, in a prosecution for arson, affidavits of jurors showing that they considered the failure of respondent to take the stand as a witness, may not be received to impeach the verdict.

9. SAME—WEIGHT OF EVIDENCE.
   *Held* that the weight of evidence did not require the granting of a new trial.

Exceptions before judgment from Lenawee; O'Mealey, J. Submitted November 12, 1909. (Docket No. 165.) Decided September 28, 1910.

Laura A. Stewart was convicted of arson. Affirmed.

*John A. Riley* and *Smith, Baldwin & Alexander*, for appellant.

*Burton L. Hart*, Prosecuting Attorney, and *Earl C. Michener*, Assistant Prosecuting Attorney, for the people.

BLAIR, J. The respondent was convicted upon an information charging that on the 23d day of March, 1908, she—

"Feloniously, unlawfully, and wilfully did set fire to and burn certain buildings, to wit, one frame dwelling house on section twenty-three (23), one frame barn on section twenty-three (23), one frame building on section twenty-three (23), all in said township of Palmyra, said buildings then and at the time of the committing of the felony aforesaid, being insured against loss or damage by fire by the Farmers' Mutual Fire Insurance Company of Lenawee county, with intent then and thereby to injure the said Farmers' Mutual Fire Insurance Company of Lenawee county, the insurer of said buildings as aforesaid," etc.

On the night of March 23, 1908, an unoccupied dwell-

ing house and two barnes belonging to respondent were destroyed by fire. The buildings were located a few rods south of the Lake Shore Railway track and about half a mile west of Grosvenor, a station at the junction of the main line and the Fayette branch. From Grosvenor a highway known as the Al. Harrison road runs south, intersecting the Toledo & Western Electric Railway at Parker's schoolhouse, about half a mile from Grosvenor. About 60 rods east of the Parker schoolhouse, on the Toledo & Western line, is a stopping place known as the "Parker Stop." The village of Blissfield is about a mile and a half east of the Parker Stop. West of the Parker schoolhouse, about one-half mile, the electric line crosses the Fayette branch, and the crossing is known as "Harrison's Crossing." Harrison's Crossing is distant a little more than a half mile from respondent's buildings.

"You could get to Harrison's by climbing one fence if you passed in a straight line, passed down Mrs. Stewart's lane, and climbed over the wire fence into her field. It is then clear field all the way except the Lake shore track. By going a little bit to the west, you could go through there by climbing one fence. These fences were the ordinary wire fences, 58-inch fence. It would be close to a mile and a half to go around the road from Harrison's stop to the Stewart buildings. * * * There is a lane running south from the Stewart buildings to the woods and Mr. Gambee's lane runs west up to her place. I do not know as these lanes meet. Mrs. Stewart's lane leads south to her pasture or wood lot. Then you go across this pasture or wood lot of hers, and you strike the Gambee lane going east to the Al. Harrison road."

The electric line runs from Toledo, its eastern terminus, to Adrian, its western terminus. Respondent left Adrian for Toledo at about 3 o'clock in the afternoon of March 23d, intending to stop over at Blissfield in order to collect some money due her from Jackson Rogers. She left the house of Mr. Rogers about 6:30 p. m., saying she was going to visit Elias Adriance. The station agent of the electric line testified that he "noticed her around there

about the time the 6:41 limited car went west, but did not see her after the car went through." The conductor of the west-bound car due at Blissfield at 6:41 p. m. testified that the car was seven or eight minutes late at Blissfield; that the respondent came to the vestibule of the car, and asked him if the car stopped at Harrison's Crossing, and he told her it depended on whether the man was there to throw the derailer; sometimes he was there and threw it for them and sometimes he was not; that she said she wanted to go there and would take the chances; that she got off the car at Harrison's Crossing at about 6:56 or 6:57 p. m. Respondent boarded the east-bound car at Parker's Stop between 8:10 and 8:13 p. m., and continued her journey to Toledo.

There is a sharp conflict in the testimony as to when the fire broke out. The time of the discovery of the fire, as stated by the witnesses for the people, ranged from 7:15 to 7:30 p. m., standard time. The witnesses for the respondent placed the time at, or a few minutes before, 7 p. m., standard time. Several of the witnesses going to the fire met a woman going south on the Al. Harrison road. The third day after the fire a woman's tracks were found near respondent's barn and in her lane and in the Gambee lane leading into a clover field 60 or 80 rods from the Al. Harrison road. Respondent told the sheriff that, after supper at Jackson Rogers', she went over to Elias Adriance's house and found no one at home, and that she then went out to the car line and walked west and met the car at Parker's Stop. According to one of the witnesses, Elias Adriance lived in Blissfield about a block north of the electric line, and about a mile and a half from the Parker Stop. Respondent was convicted, and brings the record to this court for review upon exceptions before sentence.

We shall discuss such of the assignments of error argued by counsel for respondent as in our opinion merit consideration. The principal assignments relate—

(1) To the admission of certain testimony for the pur-

pose of identifying respondent with the woman met by certain of the witnesses on the Al. Harrison road.

(2) The refusal of the court to direct a verdict of acquittal.

(3) Prejudicial argument by the prosecuting attorney to the jury.

(4) The instruction of the court that, if respondent set fire to and burned either of the buildings mentioned and set forth in the information, she should be found guilty.

(5) The refusal of the court to give respondent's 20th request to charge.

(6) The refusal of the court to grant respondent's motion for a new trial.

1. William McMillen, a witness for the people, testified:

"It was raining that night, disagreeably rainy night. I met a lady in front of Al. Harrison's house about half a mile north of the Toledo & Western Railway. This lady was Mrs. Stewart, and I knew her by her walk."

On cross-examination the witness testified that, on the examination in justice's court, he said he could not describe the woman except that she wore dark clothing, and that he did not know the woman for certain.

"What has taken place since you were sworn before that justice of the peace that has made you certain, if you were not certain then?

"*A.* Have I said I was certain that was Mrs. Stewart?

"*Q.* Didn't the prosecutor just now ask you who the woman was, and didn't you say it was Mrs. Stewart, the defendant?

"*A.* That is my best judgment.

"*Q.* Didn't you testify upon that examination that you didn't know whether she was white or black?

"*A.* Yes, sir.

"*Q.* And that was the truth, wasn't it?

"*A.* Yes, sir."

On redirect examination the witness was asked:

"*Q.* Mr. McMillen, following up that testimony, wasn't you asked, 'Did you have some judgment that night as to who it was?' and didn't you answer, 'I did?'

"*A.* Yes, sir.

"*Mr. Riley:* I move to strike out that question and answer. He is asking the witness as to his judgment.

"*Mr. Hart:* I am asking if the testimony wasn't that on the examination.   *   *   *

"*Q.* State now what your best judgment was as to the person you met that night, who she was?

"*A.* Mrs. Stewart."

To the admission of this answer, respondent took exception and assigns error. After further examination of the witness by the circuit judge, he said:

"I think this testimony may all be stricken out of this record as to the identity. The present view of the court is that this is too visionary. There is nothing of substance upon which the conclusion could rest as to the identity of that person."

Ora Butts also testified in behalf of the people as to the identity of this same woman; that he met a woman about 15 rods from Al. Harrison's, going south.

"She wore dark clothes and a hat with very little trimming on it, dark colored, and I noticed the general walk of the person and her general appearance. We passed this lady, I was afoot with Mr. Miller, and went to the fire. She was on the east side of the road. I spoke to her. I said, 'Good evening,' and she made no reply."

In the course of the examination of this witness the following occurred:

"*The Court:* Gentlemen, that we may have an understanding about striking out the testimony of the other witness on this question that is reserved here, it is merely the opinion of the witness that is stricken out, and not the facts and circumstances detailed by him and from which he attempted to and did draw an opinion; but it is the opinion itself, and that alone that is stricken out of the testimony.

"*Mr. Hart:* As I understand, the question was reserved until morning with this witness?

"*The Court:* Yes, sir.

"*Mr. Michener:* Then the only question is, they may detail everything they saw, but they can't give an opinion who that person was?

"*The Court:* His personal opinion and conclusion is

what was stricken out. All of this testimony besides that remains in the case."

After this announcement by the court, the following occurred:

"*Q.* Now, on the night in question, when you met this lady on the highway, did you notice anything about the lady that you would be able to state who it was?

"*A.* What do you mean by that?

"*Q.* Anything about the dress or appearance or walk or anything?

"*A.* I went by the walk, and I noticed her hat as much as anything.

"*Q.* And you had known Mrs. Stewart a long time before that?

"*A.* Yes, sir.

"*Q.* And knew her general walk?

"*A.* I did.

"*Q.* I will ask the question, you may state, Mr. Butts, who the lady was you met, if you know.  *  *  *

"*The Court:* I think, until there is more in this case than there is at the present time, that the objection to this opinion may be sustained. I don't think that what is offered here rises to the dignity of evidence. In the detail of the testimony given here, upon which this witness is asked to pass an opinion, there isn't anything shown, that the court discovers, that is out of the ordinary that would identify this particular lady. I think this objection may be sustained."

Later the witness was asked:

"*Q.* Did you notice the hat the lady had on that night?

"*A.* I did.

"*Q.* You may state now whether you have seen the hat since?

"*A.* I saw it once since—the day of the hearing of the examination in Mr. Humphrey's office when Mrs. Stewart had on that hat."

Witness was then shown a hat marked "Exhibit C," and testified that he had never seen the hat before, and that the lady he met in the road near Harrison's on the night of the 23d of March was not wearing that hat. Several witnesses, including a milliner who claimed to

have sold a new hat to respondent at Toledo on March 24th, testified that the hat (Exhibit C) was the old hat that she was wearing on the 23d of March, and that the hat was left in Toledo for several days, and the new hat worn in its place.

Counsel for respondent contend that it was error for the court to permit the witness William McMillen to state that the woman he met in the highway on the night of the fire was the respondent, and also to permit the witness to give his best judgment upon the question after the court had stricken out his answer that it was the respondent, and also complained of the same rulings as to the testimony of Ora Butts.  In the course of the charge to the jury the court used the following language:

" You are instructed that the testimony of the witnesses William McMillen and Ora Butts as to their opinion that they identified the defendant on the night in question, has been stricken out, and you will not consider the same in your deliberations."

We do not think it can be said, under the repeated rulings of the court and his final instructions to the jury at the close of the case, that the jury could have been misled into supposing that they were at liberty to consider the opinion of the witnesses McMillen and Butts as identifying the respondent with the person met.

2. We think the court would not have been justified in directing a verdict of acquittal; on the contrary, it seems to us that, in the absence of any affirmative testimony on the part of the defense to explain the whereabouts of respondent during the period between her leaving Mr. Rogers' house at 6:30 p. m. and her boarding the car at Parker's Stop at 8:10 p. m., the record fully sustains the verdict.  Her connection with the crime is not established by direct testimony as to her participation, but by the converging force of numerous circumstances which point quite clearly in one direction.  The case largely hinges upon the testimony of the conductor of the 6:41 west-bound car.  While it is true that this witness failed at first to

pick out the respondent when asked to do so, and while his testimony as to how he identified her is somewhat incoherent, he still affirmed positively that she was on his car that night, that he had seen her before, and knew her name.

"I am positive that she was the lady that got on my car at Blissfield that night, and who got off at Harrison's Crossing."

The testimony of the conductor is also supported by the testimony of the station agent, who testified that he saw her around the station when the 6:41 car went through, but did not see her after it had gone. It is true that respondent, in her statement to the sheriff, denied having gone to Harrison's Crossing, but such statement was only to be considered with the remainder of her statement, and not as substantive testimony in her behalf in the case.

The jury were certainly at liberty to disbelieve the testimony of the conductor and station agent, if they saw fit to, but they also had the right to accept it, if convinced of its truth as establishing the fact of respondent's alighting from the car at Harrison's Crossing, and to consider this fact in connection with her denial that she had gone there. This fact being established, as the jury must have found it was, it is difficult to resist the conclusion that the woman who was met on the Al. Harrison road within half a mile of the fire and going south towards the electric line was the same woman who boarded the 8:15 car at Parker's Stop, and who had left the west-bound car at Harrison's Crossing. Identity is not necessarily proved by direct evidence, but may be proved by circumstances all pointing towards one person. There are other circumstances disclosed by the testimony which also support our conclusion, but to refer to which would unnecessarily extend this opinion. The principal fact which is inconsistent with the people's case is disclosed by the testimony of respondent's witnesses that the fire took place at, or just before, 7 o'clock, standard time, in which event the re-

spondent could not possibly have traveled from Harrison's Crossing over half a mile and set the fires in the three or four minutes allowed her for that purpose. Some of respondent's witnesses testified with great positiveness that they discovered the fire at 7 o'clock, and noted the time by their watches. There were other witnesses, however, upon the part of the people, who testified that the fire broke out at various times from 7:15 to 7:30, standard time. This conflicting testimony manifestly raised a question of fact, which was for the jury to determine.

3. In the course of his argument to the jury, the prosecuting attorney said, "It is common knowledge that people burn buildings for insurance," to which remark respondent's counsel reserved an exception, and the court said:

"I think, gentlemen, you should take nothing from that statement."

One of the questions in the case was the question of motive for the destruction of the buildings, and respondent produced witnesses who testified that the insured buildings were worth considerably more than the amount of the insurance, and that it was a loss to respondent, instead of a gain, to have the buildings destroyed. This remark was certainly reprehensible, but, in view of the court's correction, and presuming that the jury was possessed of average common sense, we do not think that the remark could have seriously prejudiced the defendant's case.

4. We think the charge of the court was correct. The offense was committed by burning any one of the buildings, and it was not necessary to prove the burning of all three, although she was charged in the information with burning that number. We are also of the opinion that respondent's ownership of the buildings was sufficiently proved by the application and policy of insurance, the proofs of loss, and the testimony of numerous witnesses.

5. By the 20th request to charge, respondent requested that the jury be instructed:

"That the testimony of conductor Jacobs as to the identification of the defendant is not sufficient for your consideration. The witness did not show sufficient knowledge of her so that his opinion rises to the dignity of evidence, and therefore you will not consider the same."

We think that it is clear that the court would not have been warranted in giving this instruction, since the probative force of the testimony of the witness was for the jury.

6. We find no error in the refusal of the court to grant respondent's motion for a new trial. This motion is based upon the affidavits of two jurors to the effect that the jury considered the failure of respondent to take the stand as a witness in her own behalf, and that they consented to the verdict of conviction largely for this reason. As we have heretofore held, the affidavits of jurors are not receivable to impeach their verdict. *In re Merriman's Appeal*, 108 Mich. 454 (66 N. W. 372). Neither do we think that the court erred in his ruling that the verdict was not against the weight of the evidence. As we have heretofore stated in our opinion, there was an abundance of evidence, if satisfactory to the jury, to justify their verdict. The charge to the jury was mainly in the language of respondent's requests to charge, and we see no reason to doubt that the respondent had a fair trial. The exceptions are overruled and the record remanded for further proceedings in pursuance of law.

BROOKE and OSTRANDER, JJ., concurred with BLAIR, J.

HOOKER, J. (*concurring*). I do not concur in the statement that it was reprehensible for the prosecutor to say in his argument that "it is common knowledge that people burn buildings for insurance." It is as much a fact of which courts and juries may take judicial notice as is the fact commonly known that men commit burglary, robbery, and homicide for gain.

There should be no impropriety in saying to a jury any of these things in a case where the proof warrants the submission of such a question to the jury, for, if it is possible to suppose a juror ignorant of such fact, it would be full time to advise him of it.

I agree in affirming the verdict in the case.

MOORE, J., concurred with HOOKER, J.