PEOPLE v. SWIFT.

1. VENUE—CHANGE—MOTIONS—APPEAL AND ERROR.
   The denial of a motion for a change of venue is only reviewable if the court abused its discretion. Act No. 67, Pub. Acts 1909.

2. CRIMINAL LAW—CHANGE OF VENUE.
   It was not an abuse of the court's discretion to deny a change of venue on motion of respondent, who claimed that adverse newspaper comments had aroused local sentiment against him; newspaper reports are ordinarily regarded as too unreliable to influence a fair-minded man, and a juror, although

he may have formed an opinion from reading such reports, is competent if he states that he is without prejudice, and can try the case impartially according to the evidence, and if the court is satisfied that he will do so.[1]

3. SAME—TIME, LAPSE OF.

After the lapse of more than a year from the date of the alleged offense the court might take into consideration the tendency of public interest and prejudice to abate, in arriving at a determination of the question of changing the venue.

4. SAME—SECOND TRIAL.

He might also take notice of facts coming to his knowledge during the first trial of the same case in which he presided, and was warranted in deferring his final determination until the examination of the jurors as to their qualifications upon the second trial demonstrated that a fair and impartial jury could be and was selected.

5. TRIAL—OPENING STATEMENT — PROSECUTING ATTORNEY — MISCONDUCT OF PROSECUTOR—CRIMINAL LAW.

Though the prosecuting attorney fails to prove allegations made in his opening statement to the jury, it is not necessarily an indication of bad faith.

6. SAME.

Where the prosecuting attorney in opening his case to the jury stated that it was expected to show that respondent, charged with grossly immoral and indecent conduct, practiced hypnotism, and the witness who should testify to the crime was under respondent's control, but no proof of the facts stated was offered, the court charging the jury that they should not consider that phase of the case, prejudicial error did not appear.

7. CRIMINAL LAW—EVIDENCE OF PRIOR OFFENSES.

Evidence of two prior offenses between the same parties was properly admitted as having a tendency to show the secret criminal relations of the accused and the witness, and to show facts from which the crime naturally arose.

8. SAME.

It does not lie with the accused to object to the admission of competent evidence on the theory that it was of so heinous a nature, and so prejudicial to respondent, that it ought not to be used against him.

[1] The authorities on the question of a disqualification of a juror in a criminal case by opinion gained from newspaper are discussed in an extensive note in 35 L. R. A. (N. S.) 985.

9. SAME—TRIAL—CURING ERROR.

The exclusion of evidence of a conspiracy against respondent, where the court later on permitted his attorney to develop the matters at length, was not prejudicial error.

10. TRIAL—ARGUMENT—CONDUCT OF COUNSEL.

Alleged prejudicial remarks made by the prosecuting attorney in arguing the case were not sufficient ground for a new trial when the statements were called out by the argument of respondent's attorney.

11. CRIMINAL LAW—TIME OF OFFENSE—VIDELICET.

Under an information charging that the offense occurred "heretofore, towit, on the 23d day of November, 1909," evidence of a crime relied on by the prosecution occurring about a week before the day stated was admissible: proof of respondent's absence from the county on the 23d of November was not a conclusive alibi.

12. SAME—ALIBI—CHARGE.

The charge of the court that if the crime was committed during the month of November, defendant might be found guilty, that if defendant was not at the place alleged when the evidence of the prosecution showed he was there, he could not be held guilty, that an alibi was as legitimate a defense as any other, etc., sufficiently covered the points and was a correct statement of the law.

13. SAME—INSTRUCTIONS TO JURY.

The court rightly instructed the jury as to proof of previous misconduct that, even though they believed the accused guilty of such offenses, they must find him not guilty unless they were satisfied beyond a reasonable doubt of his committing the offense charged.

14. SAME—NEW TRIAL—AFFIDAVITS OF JURORS.

Affidavits of jurors cannot be received to impeach their verdict.

15. SAME.

Evidence examined, and *held,* to support a verdict of guilty.

Exceptions before sentence from Charlevoix; Mayne, J. Submitted April 18, 1912. (Docket No. 41.) Decided November 8, 1912.

Hermon L. Swift was convicted of the offense prohibited by Act No. 198, Pub. Acts 1903. Affirmed.

*Franz C. Kuhn*, Attorney General, *Dwight H. Fitch*, Prosecuting Attorney, and *A. B. Nicholas*, Assistant Prosecuting Attorney, for the people.

*E. N. Clink* (*Philip H. Travis*, of counsel), for respondent.

STEERE, J. In December, 1910, respondent was convicted by the verdict of a jury in the circuit court of Charlevoix county under an information charging him with having, on November 23, 1909, committed an act of gross indecency with a boy named Merrill Griffin, in violation of Act No. 198 of the Public Acts of 1903, which provides:

"That any male person who in public or private commits or is a party to the commission of or procures or attempts to procure the commission by any male person of any act of gross indecency with another male person shall be deemed guilty of a felony," etc.

The offense is charged to have been committed at the "Beulah Land Farm for Boys," located near Boyne City in Charlevoix county, an institution promoted and conducted by respondent and of which said Merrill Griffin, a lad about 11 years of age, was an inmate. The place was commonly called the "Beulah Home." It was advertised and conducted as a farm home for the detention, care, and training of wayward boys. It was supported by contributions from charitably inclined persons in various parts of the State, payments made by parents and guardians of boys detained there, and the products of the farm upon which the boys were required to work. At the time of the alleged offense there were some 25 or 30 boys at the Home, whose ages ranged from 8 to 15 years.

It is sufficient, without going into the unsavory details, to say that the information clearly stated facts which constitute the offense charged under the statute, and the boy Griffin positively testified to such facts. The act complained of is claimed to have been committed secretly in

respondent's room in the Beulah Home; there being no witnesses to such conduct but the two participants. Respondent's denial was by a plea of not guilty. The substantive case necessarily rested on the evidence of Merrill Griffin, the only direct witness who testified. The testimony introduced by the defense was an attack upon the credibility of the witness Griffin, and in support of a claim of alibi and a conspiracy against respondent to depose him from management and control of the Beulah Home.

The bill of exceptions presents for our consideration 127 allegations of error claimed to have been made by the circuit court during the trial of the cause. While they have all been examined and considered, many of them call for no comment beyond crediting defendant with saving all possible questions for review. It would be a remarkably versatile court which could freight with that many errors a case in which the controlling issue was a question of the veracity of one small boy.

After sorting over these allegations with a view to classifying them, they seem to condense into the questions of whether there was prejudicial error in the court denying defendant's motion for a change of venue; in a statement made by the prosecuting attorney in his opening as to hypnotic powers possessed by respondent, which was not later substantiated by testimony; in the admission and rejection of certain testimony, as to similar previous acts between the parties, and an alleged conspiracy against respondent; in certain remarks made by the prosecutor in his argument to the jury; in the charge of the court; and in its refusal to grant a new trial. The case had been previously tried, resulting in a disagreement of the jury. When it was again called up for consideration, before the second trial began, respondent moved for a change of venue, presenting lengthy affidavits by himself, his attorneys, bondsmen, and others, together with various newspaper clippings and other matters which occupy 66 pages of the printed record.

The motion was based on a claim that respondent could

not obtain a fair and impartial trial in Charlevoix county because of local prejudice against him arising from several sources. It was claimed that on his previous trial the language and conduct of the court officers were prejudicial; that a civil suit in chancery was pending against him, instituted by the purported trustees for the Beulah Land Farm by reason of which they indulged in talk derogatory to his character; and that the newspapers of the county had published false and defamatory statements against him touching said chancery suit and the criminal case then about to be tried—all of which tended to prejudice and disqualify people of the county who otherwise would be competent to act as jurors on the trial. After argument said motion was denied; the court saying:

"At the time of the selecting of the jury, if it appears that the jurors have not the qualifications that they should possess, then a change of venue can be ordered, but at this time the motion is denied."

After the case was called for trial and some time had been consumed in examining jurors as to their qualifications, and respondent had exhausted his peremptory challenges, the motion for a change of venue was renewed; respondent presenting in connection with such renewal further newspaper clippings, the most pertinent of which read as follows:

"The jury has been called back next Tuesday when the Swift Case will be taken up in circuit court. Judge Mayne has recently held that Mr. Swift is sole owner of Beulah Home and all of the funds derived from subscriptions and donations valued at $10,000."— Charlevoix County Herald, Dec. 24, 1910.

"This paper does not wish to do Mr. Swift an injustice. It does not wish to prejudice his case nor to prejudice him. It is confident he will get a fair trial. We have seen some signs, however, that various means were being used to create public sentiment favorable to him; trying to create the impression that he was a martyr. Frankly we think Mr. Swift has been guilty of trying to 'work' the papers."— Boyne City Evening Journal, Dec. 23, 1910.

The motion was again denied and a jury subsequently obtained. The time occupied in obtaining the jury is stated by counsel for the respective sides at from a little over a day to a day and a half. In his reasons for denying the change of venue, given by the court when deciding respondent's motion for a new trial, he said:

"That the decision upon the motion was without prejudice is shown by the examination of the jurors as made upon the trial of the cause when challenged as to their competency to sit as jurors. In no important criminal case within my experience has the absence of prejudice in those summoned as jurors been more marked. That the overruling of this motion did not result in injury to the respondent is shown by the fact that none of the examination of the jurors is set forth in the bill of exceptions submitted and now under consideration by me. From this I assume that, in the opinion of counsel, no error could be predicated upon the answers of jurors upon their *voir dire* examination."

Act No. 67 of the Public Acts of 1909 provides:

"Each of the said courts, upon good cause shown, may change the venue in any cause pending therein," etc.

It is only "on good cause shown" that the court has any power to act, and then he may grant the change in his discretion. In the early case of *Greeley* v. *Stilson*, 27 Mich. 153, it was said:

"A motion for change of venue is, unless where otherwise provided by law, a matter which rests in discretion, and is not subject to review."

It is, however, now recognized that where rulings on such motions are a clear abuse of discretion, manifestly subversive of justice, they may be reviewed and corrected on writ of error.

It is an elementary general rule that in criminal cases the respondent must be tried in the county where the crime is charged to have been committed; but the court may, in exceptional cases, where a special showing makes it plain that the ends of justice so demand, or where statu-

tory provisions expressly so provide, change the venue to another county. Where there are no mandatory statutory provisions, it is now settled beyond question that the court's action in ordering such a change or refusing it is discretionary, and not to be disturbed on review, unless there clearly appears a palpable abuse of discretion. 12 Cyc. p. 243, and cases cited.

A considerable portion of the newspaper clippings presented with the motion for a change of venue relates to the chancery suit over the Beulah Home. The result of that suit is stated in the clipping of December 24, 1909, from the Charlevoix County Herald, presented when the motion was renewed at the trial. By that clipping the public was advised that respondent had been vindicated and found to be in the right in his suit with the purported trustees of the Home, who he claimed had slandered him, and it would also appear in that connection that the judge who heard that suit, and who was presiding in the criminal case, could and would fairly and impartially dispose of matters coming before him in which respondent was interested. The clippings, taken as a whole, seem to be such as are often found in local newspapers in relation to somewhat sensational events and criminal proceedings thought to be of general interest. They purport to report the charges against respondent and events as they took place in that connection, in court and out. With one possible exception, no positive opinion was offered as to the guilt or innocence of the respondent. On the whole, they are of that class of publications usually appearing in the public press when such matters arise and with which all newspaper readers are more or less familiar.

" Newspaper reports are ordinarily regarded as too unreliable to influence a fair-minded man when called upon to pass upon the merits of a case in the light of evidence given under oath; and it is now a well-settled rule that a juror, although he may have formed an opinion from reading such reports, is competent if he states that he is without prejudice and can try the case impartially according to the

evidence, and the court is satisfied that he will do so." 24 Cyc. p. 298.

This offense is charged to have been committed in November, 1909. The motion for a change of venue was passed upon over a year later, when the case was on the calendar for a second trial. The lapse of time which intervened was a matter proper for the court to take into consideration; it being well known that, even in cases where adverse public sentiment and prejudice are aroused at the time, public feeling and interest soon abate. This is so well recognized that counsel for defendants in criminal cases are prone to seek delay.

It has been held that the court is not precluded from acting in part on personal knowledge possessed by it. *Giese* v. *Schultz*, 60 Wis. 449 (19 N. W. 447). This is particularly applicable to certain charges in the affidavit of counsel for respondent relative to prejudicial conduct of other members of the bar and officers of the court in connection with the case. The warrant was issued in this case on complaint of the marshal of Boyne City after an investigation made by city and county officials. Some of the official misconduct complained of is charged to have occurred during the progress of the first trial, in and around the courtroom. Charlevoix county is large geographically, with a population in the neighborhood of 20,000. The judge had presided at the trial of this case once before in that county at a time less remote from the date when the offense was charged to have been committed, had officially acquired knowledge of the prevailing sentiment amongst those called as jurors at that time, and knew something of what would be encountered in passing upon jurors' qualifications at the second trial.

It was proper and lawful for him to defer final determination of the motion until after the examination of the jurors in the case as to their qualifications, and if a fair and impartial jury could be obtained, as appears to have been the result, it is held that this may justify denying

172 MICH.—31.

the motion, even though other facts apparently entitling the accused to its being granted may have been shown, for the actuality of the main fact "demonstrates the possibility of its existence." 12 Cyc. p. 249, and cases cited. It has even been held that a failure, or delay, or difficulty in obtaining impartial jurors is not conclusive in such a case. But that does not seem to have occurred here. The length of time spent in getting a jury, or the fact that respondent exhausted his peremptory challenges, is not of controlling significance. Under the dilatory system of examining and selecting jurors which often prevails, days, and sometimes weeks, are spent in such examinations in sensational cases, and, if that could be made a controlling ground for change of venue, it would offer special inducement for counsel to exhaust their peremptory challenges and delay the case to the limit when examining jurors. We are not advised how many jurors were excused in this case, or the nature of their preliminary examinations, except as the judge, who has been upon the bench for many years, states:

"In no important criminal case within my experience has the absence of prejudice in those summoned as jurors been more marked."

It is difficult, and often impossible, for appellate courts to see matters as they actually existed and appeared on the trial to the presiding judge, and that should not be overlooked in passing upon a question of the proper exercise of discretion. We are not prepared to say that there was an abuse of discretion in this instance.

After concluding his opening statement, the prosecuting attorney asked permission of the court to make a further opening, which being granted, against objection, he stated to the jury that the prosecution expected to be able to prove that respondent practiced hypnotism, and that the witness Merrill Griffin was subject to hypnotic suggestion exercised over him by respondent. No proof on that subject was introduced or offered during the trial. In his

charge the court commented on this failure and said to the jury:

" Nothing has been said or done, no evidence has been introduced up to this time of any hypnotic power, if such a thing exists, and I do not say whether it does or not, and it is quite immaterial whether it does or not on the part of the respondent. So you will not consider this phase of the case at all."

It is asserted by the prosecution that this statement was made in the utmost good faith, and an explanation was offered, which does not appear in the record and should not appear in their briefs. All this court can consider is that in his opening the prosecuting attorney stated he expected to be able to prove certain things relative to the exercise by respondent of hypnotic powers over the witness; that he failed to do so; that the judge cautioned the jury to disregard the subject—and then determine whether or not those incidents embody prejudicial error. We cannot assume that the statement was made in bad faith. It is asserted that it was not.

" It is true that counsel referred to some matters not established by the testimony. In the opening of a case some latitude must be allowed counsel in stating what they expect to prove. That on the trial they may not be able to show all that they claimed is not necessarily an indication that the statement was not made in good faith." *State* v. *Crafton,* 89 Iowa, 109 (56 N. W. 257)'.

Failure to prove what it was stated to the jury the prosecution expected to be able to prove, can well be urged as more disconcerting and, at least, as prejudicial to the prosecution as to the defense, and it will open the door to the defense for a caustic argument to the jury, which is not usually overlooked when such opportunities present themselves. The judge in his charge emphasized the failure of the prosecution in that particular and did what he could to eliminate the subject from the deliberation of the jury.

" A failure to prove all that the prosecuting attorney, in

his opening to the jury, in good faith stated he expected to prove, is not ground for reversal." *People* v. *Ecarius*, 124 Mich. 616 (83 N. W. 628).

The prosecution was permitted to introduce testimony of two previous acts of misconduct between the same parties similar to the one relied on for conviction, in one of which a small dog figured as an interested spectator and to a limited degree as a participant. This is strenuously urged to have been prejudicial error under the well-settled rule that the prosecution may not prove another and distinct offense of the same kind for the purpose of rendering it more probable that he committed the offense for which he is on trial. To this rule there are numerous exceptions, one of which, long recognized and well established, is in prosecutions involving sexual offenses. The reasoning in support of that exception is significantly applicable to the cases like the one before us. Here peculiar secret criminal relations are involved and testified to, which, unconnected with anything leading up to them, would appear in a marked degree unnatural and incredible. The facts preceding and inducing this transaction are most essential to an understanding of the situation. Where previous acts of intercourse between the same parties are shown, it is something more than merely proving the commission of similar offenses—it is rather proving a repetition of the same offense between the same parties, identical in its criminal features. The following language, in an early case, by Judge CHRISTIANCY, in which the admission of such testimony was upheld, is particularly applicable here:

"In the order of nature, facts do not occur single and independent—isolated from all others—but each is connected with some antecedent fact, or combination of facts, from which the fact in question follows as an effect from a cause. Torn from this necessary connection, and exhibited alone, many real occurrences would appear under the guise of falsehood, and truth itself would be made to lie.

"To permit the evidence, therefore, of an isolated

transaction, which could only be made to appear probable by exhibiting the antecedent facts which induced it, and yet to exclude from the investigation all such antecedent facts, would be to set at defiance the order of nature, and the laws of truth which God has stamped upon the human mind." *People* v. *Jenness,* 5 Mich. 324.

The principles there laid down have more than once been cited with approval and followed. *People* v. *Clark,* 33 Mich. 112; *People* v. *Burns,* 67 Mich. 537 (35 N. W. 154); *People* v. *Hendrickson,* 53 Mich. 525 (19 N. W. 169); *People* v. *Skutt,* 96 Mich. 449 (56 N. W. 11); *Matthews* v. *Detroit Journal Co.,* 123 Mich. 608 (82 N. W. 243); *People* v. *Nichols,* 159 Mich. 355 (124 N. W. 25); Wigmore on Evidence, §§ 216, 357, 360, 398.

We think the testimony objected to comes within the exception and was admissible under the above authorities. The so-called "dog incident" complained of was a pertinent part of the " things done " in one of those transactions —a concomitant of the act.

"The proper inquiry, when the circumstance is offered, is, Does it fairly tend to raise an inference in favor of the existence of the fact proposed to be proved ? If it does, it is admissible whether such fact or circumstance be innocent or criminal in its nature. It does not lie with the prisoner to object that the fact proposed as a circumstance is so heinous in its nature, and so prejudical to his character, that it shall not be used against him, if it bears upon the fact in issue.

" The atrocity of the act cannot be used as a shield under such circumstances, or as a bar to its legitimate use by the prosecution." *People* v. *Wood,* 3 Parker Cr. R. (N. Y.) 681.

It was claimed by respondent that his prosecution was the result of a conspiracy, instigated by one of the older boys named Mack and a hired hand on the farm named Jones, in which some of the younger boys were induced to participate; the purpose being to depose respondent from control and secure his position for Jones, after which Mack and the other boys would have easier times, and,

with Jones' acquiescence, might ultimately escape from the farm. In the early stages of this inquiry, various questions propounded by counsel for the defense, relating particularly to Jones' words and acts, were objected to and sustained, but later in the trial the court said to defendant's counsel:

"I will say that there were some questions excluded yesterday that I think might be material, considering the testimony that was later introduced connecting Mr. Jones and the other party. I did state then, that if, later, Mr. Jones was sufficiently connected with the transaction, I would let the statement be considered. So you may cover that point if you wish—that is, present them—and I will pass upon them again."

After this statement by the court, further testimony relative to a conspiracy, including what Jones said and did, was introduced. That subject was quite fully gone into, and we think ample opportunity was given defendant to present all legitimate testimony offered.

It is urged that the case should be reversed on account of certain unfair and prejudicial remarks of the prosecuting attorney in his argument to the jury. We have no hesitation in concluding that some of them are perfectly legitimate argument; others, in the fragmentary and manifestly incomplete form they appear in the record, without context or that to which it might be implied they are a reply, seem intemperate and perhaps prejudicial. In his reasons for denying a motion for a new trial, the court said:

"These remarks, if prejudicial, which I do not so consider, were in direct answer to allegations of fact made by respondent's counsel in his argument that respondent personally and other witnesses had testified to certain facts. This statement by counsel was incorrect. If the prosecuting attorney were to deny these assertions of fact by counsel for the defense at all, he must use either the exact language which he employed or other language of the same import. He cannot, in justice to the people's cause, allow these statements to go unchallenged."

Respondent was not sworn, and of course did not personally testify.

We are unable to say from the record that these remarks were not justified by the arguments of opposing counsel or warranted by the evidence, or that the court did not properly exercise the discretionary control which we have held rested with him. *People* v. *Tubbs,* 147 Mich. 1 (110 N. W. 132); *People* v. *Peck,* 147 Mich. 84 (110 N. W. 495); *People* v. *Davis,* 171 Mich. 241 (137 N. W. 61); *People* v. *Neely,* 171 Mich. 249 (137 N. W. 150).

Numerous errors are assigned on refusal of the court to give defendant's requests to charge and on the charge as given. Twenty-two requests were presented. While none of them was given in the language of the request, and they were all marked "refused," the material substance of many was given and the subjects they presented covered beyond the possibility of being seriously questioned. Counsel particularly complain of failure to give seven enumerated requests relating to the alibi feature of the defense, which it is stated were intended specifically to call attention to that subject "in such a way as to get the proper benefit and advantage of the same in case the jury found the facts involved therein in his favor, or in case they were not able to agree on adverse findings as to such facts." Three requests are pointed out as unquestionably entitled to be given under *People* v. *Hare,* 57 Mich. 505 (24 N. W. 849). They are as follows:

" (10) I charge you that if the evidence offered on the part of the defendant, to the effect that the said Hermon L. Swift was in the southern part of the State at the time the people claim the offense was committed, raises a reasonable doubt in your minds as to whether he was present at the Beulah Land Farm at Boyne City at the time the evidence of the people alleges the offense to have been committed, then you should not convict the respondent.

"(12) The defense of an alibi, as it is called, is as legitimate a defense as any other defense, and you are to give

the same credit to witnesses who testified concerning it as
to those who testified to anything else, and, if you believe
it to have been established, then you are bound to acquit
the defendant.

"(13) I further charge you that you must all be of one
mind as to whether the defendant, Hermon L. Swift, was
at home at the time the evidence in this case alleges the
act to have been committed, and you are not at liberty to
convict the defendant, part of you believing that he was
in the southern part of the state at that time and part of
you believing that he was at home, and if you cannot all
agree that the defendant, Swift, was at home at that time
you should not convict the defendant."

No. 12 is copied from request No. 17 in the *Hare Case,*
and No. 13 here closely follows No. 21 in that case. Hare
was charged with the murder of one McCrone on a certain
date. McCrone might have been murdered by others on
that date in Hare's absence. A witness named Billing-
ton gave evidence that he was present and saw Hare com-
mit the deed; testifying positively as to the place, partic-
ular day, and time of the day. His was the only testi-
mony as to time, and from his testimony McCrone could
not have been killed at any other time. Under such testi-
mony it was held certain specific requests as to alibi should
be given. In this case the offense is charged under a
videlicet as occurring "heretofore, to wit, on the 23d day
of November, A. D. 1909."

Time was not of the essence of this offense. It could
be stated in the information as one time, and the proof
might show another; evidence could be given of such an
act within the jurisdiction of the court and the statute of
limitations, and the act indicated by the evidence could
thenceforth be deemed the act charged. The boy Griffin
was unable to give the exact date, by month and number.
The prosecution appears to have early recognized that he
could not clearly do so. Counsel stated to the court that
he relied on a specific act committed a week or two before
the date set up in the information, "on or to wit, on or
about that date, it might have been a week or two weeks

before that." Griffin testified to three distinct transactions—one in the summer, in August, in "Willis Roberts' room," one before that in the "guest room," and the one on which the prosecution relied for conviction in respondent's room.

"A little before Thanksgiving Day the last act was committed—about a week or two before." "About a week before I went to Rowan's," "when I went up in his room the last time he gave me one-half dozen postal cards. * * * He had a whole lot of them packed in his suit case. The suit case was open the time I saw it. This last act of indecency occurred before he went away and that was in November." "I have no means of remembering except the post cards."

In answer to suggestive questions as to dates, his testimony was inharmonious and unsatisfactory. His best knowledge of the time was manifestly by its relation to the season of the year and other events which would naturally interest a young boy. It appeared from other testimony that respondent was away from the Home on a trip of 10 or 12 days, returning on the evening of November 24th. Griffin testified to his going on that trip, though unable to give dates, and consistently maintained the act took place shortly before.

So far as the principles involved in the requests quoted apply to the facts in issue in this case, we think the instructions given were sufficient. On that branch of the case the court said in part:

"Now, as to the time of committing this offense, * * * I will say it is not necessary for the people to allege the identical day of the month upon which the offense was committed. It is charged as being on the 23d day of November. If you find that this act took place as claimed by the people, but that it was not on the 23d but on some other day prior thereto during the month of November, that is sufficient. * * * The defendant in this case asserts an alibi. Now an alibi means that this defendant was not there at the particular time and place testified to by Merrill Griffin; that he was somewhere else, in the southern part of the State. Now an alibi is as legitimate

a defense as any other; in fact, it is a perfect and conclusive defense. Mr. Swift could not commit this offense if he was in the southern part of the State; he must have been at Beulah Home and in that room of the Home with Merrill Griffin when he committed it. Now some testimony has been admitted as to a trip that Mr. Swift made. This offense, if committed at all, must have been committed prior to his making that trip; it could not have occurred during his absence. Of course you need no law to tell you that, gentlemen. The question is, Did it occur as claimed by the boy? And it must have occurred before taking that trip if it did occur at all."

On the questions of reasonable doubt, and the jurors all being of one mind before they could convict, we think the court charged fully and correctly, in language as plain and easy for the jury to understand as that contained in the request presented by counsel.

We think the court also sufficiently instructed the jury as to the manner in which proof of previous offenses should be considered by them. He stated to them that, even though they should believe such previous offenses had been committed, they could not find respondent guilty unless they were satisfied beyond reasonable doubt that he committed the third specific offense, on which the prosecution relied; that the others could only be considered as bearing upon the relationship which existed between Merrill Griffin and respondent, in so far as that relationship might throw light upon the facts and circumstances proven in connection with the offense specifically charged; concluding:

"So you will determine in this case the guilt of respondent solely with relation to the offense charged."

As to the individual responsibility of jurors, the court said:

"There are 12 of you jurors, each one of you having an individual responsibility equal to that of each and every juror in the case. You are to take this testimony and harmonize it; it is your duty to harmonize it, if possible, with the innocence of the accused, because under

our law it is the duty of jurors in every criminal case to enter upon the trial of the case with the presumption of innocence and harmonize all the testimony in the case in accordance with the presumption that he is innocent."

Without referring further to the exceptions taken to the charge of the court, we are satisfied that the case was fully and fairly submitted to the jury by a charge which covered all material issues involved, advising the jurors of the nature of the case and their duties in that connection. The issue of fact for them to decide was well defined and simple. The rules of law for them to follow in deciding the facts were elementary. If once clearly stated to them in plain language that is, as a rule, sufficient; subsequent technical elaboration in varying phraseology, with delicate distinctions over which counsel themselves might, and often do, disagree, would seldom aid and often bewilder.

After the verdict, respondent's counsel made a motion for a new trial, basing his application on the court's denial of a change of venue and various other errors alleged to have arisen in the case. This motion was denied and later renewed; counsel alleging that the verdict was against the weight of evidence and that certain jurors convicted respondent against their inclination, claiming to have misapprehended the charge of the court and to have been improperly influenced by the persuasions of other jurors. In support of the latter proposition the affidavits of certain jurors were presented.

No question of extraneous influence was raised, and it is well settled that the affidavits of jurors cannot be received to impeach their verdict. *People* v. *Stewart,* 163 Mich. 1 (127 N. W. 816), in which the court said:

"This motion is based upon the affidavits of two jurors to the effect that the jury considered the failure of respondent to take the stand as a witness in her own behalf and that they consented to the verdict of conviction largely for this reason. As we have heretofore held, the affidavits of jurors are not receivable to impeach their verdict."

This question is fully discussed and authorities cited by Judge Montgomery in *Re Merriman's Appeal*, 108 Mich. 454 (66 N. W. 372).

It is most strenuously urged in support of the motion for a new trial, that the verdict is manifestly against the weight of evidence and a gross injustice which should be righted by this court. To sustain this contention, the testimony and character of the witness Griffin are reviewed and vigorously attacked. It is urged that his testimony is so full of contradictions, inconsistencies, and omissions as to be wholly unworthy of belief. We are told in counsel's brief—

"That Merrill Griffin, at the time these charges were made and this trial was had, was still an unmitigated liar is so clearly shown by the record in this case that no one can fairly question it."

That there are contradictions in his testimony is apparent; that he was a *mauvais sujet*, a wayward boy, and intrusted to respondent's care for that reason, is undisputed. All his shortcomings and the inconsistencies of his story were thoroughly sifted and emphasized before the jury. When he was on the witness stand, skilled counsel, equipped with the testimony he had twice previously given, before the justice and on the former trial, subjected him to a grueling cross-examination which laid bare all the shortcomings of his short life and disclosed from every angle the weak points in his testimony. He was a boy 11 years old, evidently of immature intellect, in no sense competent to hold his own in such an endurance run, or by cunning to either meet or evade the searching quiz of respondent's attorneys. He was before the eyes of the jury to be observed and studied; they saw and heard the worst. His story was undisputed, except by its alleged self-contradictions and the impeachment of his character and veracity. Apparently he was not altogether bad if respondent's measure of him is to be credited. About the time these troubles arose, in a letter to the boy's father dated November 10, 1909, respondent wrote:

" I am glad to report that he is doing fine in school and everywhere, and in fact we have not been able to find any fault with him whatever; he is O. K."

We are asked to set aside this verdict, against the judgment of the jury and the trial judge, on the ground that the testimony was a malicious falsehood, instigated by Jones, the hired man, and some of the boys on the farm, in a conspiracy to compass respondent's ruin and get rid of him, to which the public officials were party, either knowingly and maliciously or as ignorant and misled tools. Their conduct and motives are questioned and impugned.

In reviewing that proposition, we can with propriety consider somewhat the nature and history of this case as disclosed, not only by the testimony taken at the trial, but the record as a whole. It is a criminal prosecution, instituted in the name of the people of this State, presumably in the public interest, for the suppression of crime and protection of society. While such is the presumption in all criminal proceedings, it is not always the fact. In this case matters were taken charge of by public officers; the complaint was made by the city marshal after an investigation of conditions at the institution had been made both by city and county officials. The matter was first called to their attention by one George Snell, a contractor and builder of many years' residence in Boyne City, who happened to be working at the Beulah Home. He is not shown to have had any interest or motive beyond that of any other citizen, and testifies that he has not. He says that he first learned of such conditions from Jones, who told him something of certain talk among the boys; that he himself then interviewed the boys and got the facts from them; that in such interviews he particularly admonished them to tell nothing but the truth; and, after talking with them, he later, accompanied by Jones, laid the matter before the officers. Jones, when called as a witness, frankly corroborates this; states that he overheard the boys talking among themselves; that he told

Snell of it, who questioned the boys and said it should be reported to the officers. He emphatically denies that he had any thought of a conspiracy or any motive of personal interest, or made any attempt to influence the boys in any way. He denies that he ever even talked with the witness Griffin about the matter. To set aside this verdict is to find that this young boy, under the circumstances which the history of this case discloses, was able with a fabricated story to fool and deceive Snell, the city and county officials, the jury who heard the case, and the judge who denied the motion now under consideration, all of whom were on the ground, with opportunities to hear and see and judge the facts not available to one with only the printed record before him.

It is to be borne in mind that in the trial of criminal cases the special prerogative of the jury is to judge the facts and in that connection pass upon the credibility of witnesses, to be confronted by whom, in the presence of the court, is the constitutional right of the accused when put upon trial—a provision of law which emphasizes the importance of those who are to judge hearing and seeing the witnesses—thus in effect making hearing and seeing part of the evidence. In reviewing the decision of the trial court denying a motion for a new trial, based upon the claim that the verdict was against the weight of evidence, the appellate court does not pass upon the facts in the case further than to determine whether or not there was manifest abuse of discretion. We are unable to conclude that such was the case here. 3 Comp. Laws, § 11963, provides:

" SECTION 1. The court in which the trial of any indictment shall be had, may, at the same term, or at the next term thereafter, on the motion in writing of the defendant, grant a new trial, for any cause, for which by law a new trial may be granted, or when it shall appear to the court that justice has not been done, and on such terms or conditions as the court shall direct."

This case was tried in December, 1910. The first mo-

tion for a new trial is dated April 26, 1911, and the second September 5, 1911. The official designation of times for holding terms of the circuit court in Charlevoix county shows that a February term intervened before the first motion was made. Counsel for respondent, with commendable professional candor, advert to this and say:

"Unless the failure of the prosecuting attorney to raise this point in either the circuit or the Supreme Court is a waiver of the right of the people to insist upon the time limit for making motions for a new trial, the court may feel that, under former decisions, the motion was made too late."—citing *Frazer* v. *Judge of Recorder's Court,* 112 Mich. 469 (70 N. W. 1042).

In view of the facts that counsel for the prosecution have remained silent upon the subject, while counsel for the defense have so frankly called attention to it, and that both sides have fully briefed the motion, we have thought it best to treat the same as though the point was waived, although not satisfied under the case above cited that this can be done.

For the reasons heretofore stated, the conviction is affirmed.

MOORE, C. J., and McALVAY, STONE, and OSTRANDER, JJ., concurred. BROOKE and BIRD, JJ., did not sit.