PEOPLE *v.* BEAN.

1. Criminal Law—Denial of Motion for New Trial Reviewable.
    Denial of defendant's motion for new trial in criminal case, on ground that verdict was against great weight of evidence, where made within 30 days after verdict, is reviewable by Supreme Court (3 Comp. Laws 1929, §§ 17355, 17356, 17370).

2. Same—Homicide—New Trial—Weight of Evidence.
    Defendant's conviction of assault with intent to murder, based wholly on circumstantial evidence, is set aside, on review, where evidence cannot be said to be so complete as to exclude any other hypothesis than guilt of defendant; and trial court, in passing on motion for new trial on ground that verdict was against great weight of evidence, expressed serious doubts of defendant's guilt.

Appeal from Oceana; Pugsley (Earl C.), J. Submitted April 14, 1932. (Docket No. 173, Calendar No. 35,711.) Decided June 23, 1932.

William R. Bean was convicted of assault with intent to murder. Reversed, and new trial granted.

*Gerald M. Meehan,* for appellant.

*Paul W. Voorhies,* Attorney General, and *R. Glen Dunn,* Special Assistant Attorney General, for the people.

FEAD, J. Defendant reviews conviction for assault with intent to murder. Within 30 days after verdict, 3 Comp. Laws 1929, § 17356, motion for new trial was made, on the ground that the verdict was against the great weight of the evidence, and later denied. The denial is reviewable by this court. 3 Comp. Laws 1929, §§ 17355, 17370; *People* v. *Kuhn,* 232 Mich. 310; *People* v. *Swift,* 172 Mich. 473; *People* v. *Mullane,* 256 Mich. 54.

About nine o'clock in the evening of October 14, 1927, someone shot through the window of Herman Weber's summer cottage, in Oceana county, and wounded him. His wife turned out the light, and they tried to staunch the flow of blood. Being unable to do so, Weber decided to go to Shelby for medical attention. As Mrs. Weber was going down the porch step she was shot in the shoulder and arm, and some five or ten minutes later she was again shot across the neck. Weber saw a man running away, some 125 feet distant, whom he afterward described as weighing about 150 pounds. Defendant's weight was not shown in the evidence, but evidently the man Weber saw bore no resemblance to him, as Weber did not identify defendant but later identified another person as resembling the man he saw.

A few days later, defendant was arrested for investigation, but released. After a one-man grand jury inquiry, extending over a period of a year and

a half, defendant was formally charged with the offense in the fall of 1930.

For motive, the people relied upon four incidents, all occurring a year and a half before the assault:

(1) Weber bought the land in 1925 from one Hilt. Defendant was living on it. Weber told him in the fall he would have to vacate in the spring, and he did.

(2) Defendant claimed Hilt owed him $600 for work on the place. In April, 1926, while defendant was working for Weber, the claim was settled for $25. Weber took part in the settlement, but the record does not show in what way, except to advance part of the money to pay defendant. Defendant was not and is not satisfied that the settlement was fair.

(3) In the early spring of 1926, Weber gave defendant and another permission to plant a crop of beans on the land; they started to plow sodded ground; Weber stopped them, and they raised a crop on other land.

(4) Weber gave defendant a piece of old fence. When, after considerable time, defendant did not take it, Weber gave it to another, as he wanted it removed. Later, Weber gave defendant another piece of fence, and he took it at once.

In connection with some of these incidents, especially the settlement, defendant expressed dissatisfaction with Weber's conduct at the time, making irritable but not threatening remarks. It was testified that, as late as July, 1927, in recounting the bean deal, defendant said he would get even with Weber some time. No motive was shown or suggested for the vicious assault on Mrs. Weber.

On the other hand, the testimony is undisputed that, during the summers of 1926 and 1927, defendant worked for Weber, at times was paid for his work, traded work with him, did some work for him without pay, visited the Webers occasionally, had

some meals at their home, frequently loaned Weber carpenter tools, and acted toward the Webers, and was considered by them, as a good friend. In fact, when defendant was first arrested, Weber was indignant, and said he would go bail for him. No unfriendly act by defendant toward the Webers, prior to the assault, was shown.

The case against defendant is wholly circumstantial. The principal circumstances may be summarized:

1. Defendant is a bachelor, then living with the LeFevre family, a scant half mile south of Weber's place. Between them, and about 700 feet from Weber's, lived Henry Omness, an important witness, with whom defendant had had a lawsuit. Defendant was a carpenter by trade, but at times had been a lumberjack, farmer, and laborer, and had done some trapping. He had once been charged with rape on his half-sister's daughter, but, after two trials in which the juries disagreed, the case was dismissed. He had once shot a dog. He owned two old cars, team of horses, cow, implements, and a dog. He had some sort of a contract on his farm, whether purchase or lease does not appear. These circumstances carry no conclusion of violent disposition or of a mentality which would nurse trivial grievances into murderous impulses.

2. Defendant knew Webers did not keep a dog, gun, or telephone. He could walk to their place in about 12 minutes. He and the LeFevres said he went to bed about 8:30. Allowing for the difference in time, it was possible for him to have gone to Webers and committed the assault after the LeFevres last saw him that night.

3. About two o'clock in the morning some neighbors, looking for the assailant, came to defendant's

home, woke him up, and, while he offered to do anything to help if they called on him, he did not offer to go with them. After the assault he did not visit the Webers.

4. The offense evidently was committed with a 12-gauge shotgun. Defendant owned such gun. So did a large number of other people in the community. When officers came to defendant's place the Tuesday after the assault, his gun appeared to have been lately cleaned, but how lately the officers could not say. Defendant told them he had the gun out to shoot a hawk, but had not shot it for three weeks or more.

5. Weber testified that, a year before the trial, defendant told him he had done the shooting. Defendant's version of the incident was that he and Weber were discussing the rumors, and, in substance, Weber said he and his wife had been accused of shooting each other, and defendant said that, according to some of the officers, he was the guilty person. Weber's attitude toward defendant has undergone a marked change as time passed and the assault remained a mystery. He was clearly impeached by officers with reference to statements of friendliness toward defendant, which he had made at the time of defendant's arrest immediately after the assault and with reference to having pointed out a real estate agent, with whom he had had trouble, as corresponding to the assailant he had seen running away.

6. LeFevre and defendant testified that when they got ready for bed the night of the assault they heard their dogs barking, went outdoors, could not ascertain the cause of the disturbance, returned to the house, put out their lights, and the dogs barked again in a few minutes. Henry Omness corroborated this testimony, except in one respect. He testified he

heard a shot, went outdoors, saw a light at the Weber cottage and one at defendant's. He heard the second shot, the dogs barked again, and defendant's light was out. The difference in the testimony is that defendant and LeFevre testified their dogs were barking angrily, while Omness said defendant's dog was crying with the tone he uses when his master is away from home.

Defendant's conduct after the assault was not inconsistent with innocence, and contained no element of concealment. He visited the Webers at the hospital. When officers came to his place a few days after the assault and asked him if he had a gun, he pointed to his 12-gauge shotgun on the wall, gave them two boxes of shells and another shell he had found. On his release from jail he loaned the gun to officers for experiment, freely aided them in the experiments, and finally sold the gun to an officer on request.

There was considerable testimony that he made remarks in crowds indicating how the assault was committed and that he claimed to know the assailant. The affair aroused intense interest in the community, and, as might be expected, a great many people aired their theories and pretended special knowledge. The public nature of defendant's conduct in this respect was that of the usual local wiseacre and would hardly be expected of the assaulter.

The shells used in the assault had been tampered with, the shot removed and replaced by steel balls, somewhat imperfect ball-bearings, sold generally for airgun use. None of such balls was found in defendant's possession, nor, although inquiry was made in the neighborhood, was there evidence that he had purchased any, nor that he had gone away from home so that he could have purchased them elsewhere.

Many witnesses were sworn, and a mass of testimony was introduced. Evidently the grand jury investigation had disclosed all the evidence that bore against defendant. The outstanding feature of the case is that no witness testified to an overt act of defendant which indicated his guilt and which was not as consistent with his innocence. While we appreciate the superior opportunity of the jury to pass upon the character and credibility of witnesses, a reading of the record leaves a strong impression that the atrocity of the crime aroused such local feeling that a conviction of someone was deemed necessary. Undoubtedly the record discloses some circumstances directing suspicion toward defendant, probably more than point to any other individual. But, adding the circumstances together, with Weber so completely impeached, we are of the opinion that it cannot be said that they form so complete a chain as to exclude any other hypothesis than the guilt of defendant.

In passing on motion for new trial, the court expressed serious doubt of respondent's guilt, and denied the new trial only because he did not have the positive conviction that he was not guilty.

Upon the whole record, we feel that the judgment should be reversed and a new trial ordered. Defendant will be remanded to the sheriff of the county, to be held in custody or let to bail in due course of law.

CLARK, C. J., and McDONALD, SHARPE, NORTH, WIEST, and BUTZEL, JJ., concurred. POTTER, J., did not sit.