PEOPLE v MUHAMMAD

PEOPLE v FOWLER

Docket Nos. 91940, 93728. Submitted May 19, 1988, at Detroit. Decided August 17, 1988.

Umar Muhammad and Larry N. Fowler, both black, were charged with bank robbery, assault with intent to murder, breaking and entering with intent to commit larceny, and two counts of possession of a firearm during the commission of a felony, St. Clair Circuit Court. The court dismissed the breaking and entering charge against each defendant. Defendants contended that the stop and search of their vehicle by the police was illegal and that all evidence thereby obtained should be suppressed. A hearing on that contention revealed that the officer stopping defendants' vehicle knew that a robbery had been committed by two black people about a fifteen minute drive from the site of the stop, that robbers often switched vehicles shortly after the crime, that black criminals after committing a crime would often head in the direction defendants were going on the road they were taking and that it would be rare to see blacks on that section of road at that time of day. Based on that knowledge, the officer determined to stop the first vehicle with blacks in it, which was defendants' vehicle. When he did, he was shot at by at least one occupant of the vehicle. He and another officer gave chase and eventually arrested defendants. The court held that under the circumstances the stop was permissible. At trial, Muhammad made repeated requests for a separate trial, which the court refused. Muhammad also complained when the prosecutor used his peremptory challenges to exclude three of four blacks from the jury. The court ruled that the challenges were properly exercised. Muhammad was convicted of bank robbery, assault with intent to murder, two counts of felony-firearm and, later, being a fourth felony offender. Fowler was convicted of bank robbery,

REFERENCES

Am Jur 2d, Criminal Law §§ 372 *et seq.,* 378, 525 *et seq.*

Am Jur 2d, Trial §§ 17 *et seq.*

Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.

assault with a dangerous weapon, one count of felony-firearm and, later, being a second felony offender. Both were sentenced, Ernest F. Oppliger, J. Each appealed. The appeals were consolidated by the Court of Appeals.

The Court of Appeals *held:*

1. The facts and circumstances existing prior to the stop of defendants' vehicle supported the reasonableness of the officer's decision to investigate.

2. It is error for the trial court not to grant a defendant's motion to sever the trial where the court is put on notice of a potential conflict between the defendants and this conflict becomes clearly apparent as the defendants present their cases. A conflict was apparent since Fowler confessed and implicated Muhammad while Muhammad blamed two other individuals for the crimes. The court should have granted Muhammad's request for a separate trial.

3. The court did not abuse its discretion by denying defendants' request for a change of venue. A change of venue is not necessary even though jurors have been exposed to adverse publicity and hold preconceived notions of guilt or innocence if they can lay aside their impressions or opinions and render a verdict based upon the evidence presented in court.

4. The trial court's ruling that the prosecutor's peremptory challenges were properly exercised was correct.

5. The trial court properly allowed two felony-firearm charges and convictions.

6. The trial court erred in dismissing the breaking and entering charge since all the elements of the offense were established at the preliminary examination and at trial. However, the fact that the court improperly dismissed the charge and then let evidence of the crime be introduced should not inure to Muhammad's benefit and be the cause of a new trial.

7. The court properly denied Muhammad a new trial based on his claim that his right to counsel had been compromised.

8. The court failed to articulate reasons for defendant Fowler's sentence. However, the failure of a trial court in sentencing an offender to expressly state on the record the reasons for the sentence imposed does not require remand for resentencing where the sentence imposed falls within the guidelines and does not shock the judicial conscience.

Affirmed as to Fowler, and reversed and remanded as to Muhammad.

CYNAR, J., concurred in result only.

HOOD, J., concurred in result but differed on two issues. He would hold that the initial stop of defendants' vehicle was illegal but that there was no need for the trial court to suppress the evidence because, when the driver of the vehicle came out of the vehicle firing a weapon at the officer, the fact of the illegal stop became irrelevant and the officer had probable cause to pursue and apprehend the vehicle. He also was not prepared to grant that the prosecutor's peremptory challenges were not racially motivated, but, since the prosecutor put forth a racially neutral explanation for each, he concluded that the court did not clearly err.

1. CRIMINAL LAW — TRIAL — JOINDER — SEVERANCE.

It is error for a trial court not to grant a defendant's motion to sever the trial where the court is put on notice of a potential conflict between the defendants and this conflict becomes clearly apparent as the defendants present their cases.

2. CRIMINAL LAW — VENUE — CHANGE OF VENUE.

The existence of pretrial publicity does not by itself require a change of venue; a change of venue is not necessary even though jurors have been exposed to adverse publicity and hold preconceived notions of guilt or innocence if they can lay aside their impressions or opinions and render a verdict based upon the evidence presented in court.

3. CRIMINAL LAW — SENTENCING — APPEAL.

The failure of a trial court in sentencing an offender to expressly state on the record the reasons for the sentence imposed does not require remand for resentencing where the sentence imposed falls within the guidelines and does not shock the judicial conscience.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert H. Cleland,* Prosecuting Attorney, and *Peter B. George,* Chief Appellate Attorney, for the people.

*Chokwe Lumumba,* for defendant Muhammad on appeal.

State Appellate Defender (by *Peter Jon Van Hoek*), for defendant Fowler on appeal.

Before: HOOD, P.J., and CYNAR and R. B. BURNS,* JJ.

R. B. BURNS, J. Following a trial before a single jury, defendant Fowler was found guilty as charged of bank robbery, MCL 750.531; MSA 28.799 (Count I), guilty of the lesser included offense of assault with a dangerous weapon, MCL 750.82; MSA 28.277 (Count II), guilty as charged of possession of a firearm during the commission of a bank robbery, MCL 750.227b; MSA 28.424(2) (Count IV), and not guilty as charged of possession of a firearm during the commission of an assault, MCL 750.227b; MSA 28.242(2) (Count V). Defendant Muhammad was found guilty as charged of bank robbery, MCL 750.531; MSA 28.799 (Count I), guilty as charged of assault with intent to murder, MCL 750.83; MSA 28.278 (Count II), guilty as charged of possession of a firearm during the commission of a bank robbery, MCL 750.227b; MSA 28.424(2) (Count IV), and guilty as charged of possession of a firearm during the commission of an assault, MCL 750.227b; MSA 28.424(2) (Count V). Defendants had also been charged with breaking and entering of an occupied dwelling with intent to commit larceny, MCL 750.110; MSA 28.305 (Count III). The trial judge dismissed these charges.

Later defendant Fowler was convicted by a jury of being a second felony offender. Defendant Fowler was sentenced on Count I to life with no credit for time served to run consecutively to the sentence for the felony-firearm conviction and four to six years with credit for time served on Count II to run concurrently.

Defendant Muhammad was convicted by a jury

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

of being a fourth felony offender. Defendant Muhammad was sentenced on Count i to life with no credit for time served, to run consecutively to the sentence for the felony-firearm convictions. Muhammad was sentenced for assault with intent to murder and being an habitual offender, MCL 769.12; MSA 28.1084, to life with no credit for time served, to run consecutively to the sentences for the felony-firearm convictions, which ran concurrently.

On January 7, 1985, at approximately 11:20 a.m., a bank robbery occurred in Fort Gratiot Township, St. Clair County, Michigan, at the Port Huron branch of the Michigan National Bank, located on 24th Avenue. Two persons rushed into the bank. One leaped onto the counter at the teller's window and the other jumped over the counter. Both wore ski masks pulled down over their faces, gloves and dark green zippered sweatshirts. Both carried guns. The man on the counter was approximately 5'8" to 5'9". Both men were black. Black skin was visible underneath the ski masks. The tellers were ordered to put money in bags which the robbers were carrying. The person on the counter had a cloth pillowcase and the person in the teller's area behind the counter had a white plastic bag. Money was placed into the bags along with a die pack designed to go off when the persons left the bank and a packet of "bait money" with serial numbers known.

Upon leaving the bank, the robbers were observed by a witness in the parking area. She noticed two masked men carrying white bags and guns run out of the bank and get into a white or ivory colored vehicle, a Trans Am or Camaro. As they got in the car a "red bomb went off in the bag" and one man dropped it there. They drove off

in a southerly direction through the K mart parking lot.

A deputy sheriff arrived at the scene within minutes and received a description of the robbers and the getaway car. He was given a partial license plate number, 773. He radioed this information to the dispatcher. From the parking lot, he retrieved a bag of money covered with red dye.

Deputy Sheriff Raymond Gleason heard the report of the robbery and proceeded to the turnaround at I-94 and Griswold Road to observe westbound traffic. This was at approximately 11:25 A.M. to 11:27 A.M. Gleason was watching for suspects heading for the Detroit/Mount Clemens area. At 11:33 A.M., he noticed a red and black Ford Bronco with one black male driving. He immediately pulled out and followed it. He called in the license plate number and advised that he would be stopping the vehicle.

Following the stop, the driver of the Bronco got out and, aiming a gun directly at the deputy, began firing. Gleason heard one shot and then a second shot. He saw the windshield break and he was hit in the head. He was stunned momentarily and went face down on the seat. After a couple of seconds, Gleason was able to move. He radioed that he had been shot. He heard the Bronco pull away. He wiped the blood from his face and decided he was able to function. He decided to follow and catch up with the Bronco.

Gleason pursued the Bronco down westbound I-94. A roadblock had been set up at the Smith Creek exit. Just before reaching the roadblock, Gleason observed the Bronco go across the median and the eastbound lane, through a ditch and then through the Intermediate School District Skill Center on Range Road.

Gleason followed, along with a Marysville police

car from the roadblock. The Marysville unit was ahead of Gleason. The chase ended at a residence located at 815 Range Road.

Assistant Chief Timothy O'Boyle got out on the passenger side of the Marysville police car and ran around to the field behind the residence. O'Boyle pursued the robbers in the field. Gleason followed. When Gleason approached, the suspects were lying face down in the field. Gleason handcuffed the suspects while O'Boyle covered. The suspects were arrested. O'Boyle retrieved from the field the pillowcase thrown down by defendant Fowler. A large sum of money, a Ruger short-barreled revolver and a black holster were found inside. When defendant Muhammad was raised to his feet, a Smith & Wesson revolver was found on the ground where Muhammad had been lying.

On May 13 and 23, 1985, motions were heard by the trial judge as to defendant Muhammad's motion in limine to exclude his codefendant's statements. The prosecutor alleged that he did not intend to use the statements. However, the statements might be used against defendant Fowler in cross-examination or re-examination. The trial judge held that he would not allow the statements to be used without a hearing.

Defendants also contended that the stop of the Bronco was an illegal stop and an illegal search because Officer Gleason only stopped the Bronco because it contained a black driver. Therefore, all of the evidence obtained was the fruit of an illegal stop, arrest, detention and seizure. The trial judge held:

> I'm satisfied that there exists the element of probable cause. It was in the mind of the district judge when he bound this matter over, that's what you're talking at this time. As the case proceeds

and the facts indicate you have some support for your position as it relates to your position, I will let you renew your position at that time. There is certainly no basis that I can find for your motion to quash the information at this time and point. That also goes for the motion to dismiss with regards to defendant Fowler, in this matter as it relates to both the breaking and entering charge and the assault with intent to murder. The intent to commit larceny has to be proven and again if it isn't shown of course that creates a factual situation at the time of trial, also the intent to murder.

Defendant Fowler moved to sever the individual counts. Defendant Muhammad moved to sever the trial. The trial judge held that the counts arose out of substantially the same transaction and denied the motions.

It was determined that the motion to suppress the evidence because of an illegal stop would require an evidentiary hearing.

At the evidentiary hearing relating to the traffic stop made by Deputy Gleason, Deputy Sheriff Terry G. Baker testified that he received a radio call about the bank robbery at 11:22 A.M. January 7, 1985. At the bank, he was given a description of the robbers and the getaway vehicle. He radioed the description within two minutes.

Deputy William Herpel testified that approximately eleven minutes after he received the radioed description of the vehicle he discovered the getaway car abandoned less than a mile from the bank. It was still running. Just as Herpel attempted to broadcast this information, Deputy Gleason was broadcasting that he had been shot. For the safety of the officers, Herpel ceased trying to broadcast until the chase and capture of the suspect was completed.

Herpel stated that a common method of opera-

tion for bank robbers is to immediately get rid of the getaway vehicle and switch to a "cold vehicle." That is why he searched for the getaway vehicle within a mile of the robbery.

Deputy Sheriff Thomas Carr testified that the standard operating procedure in attempting to stop a vehicle is to radio in a description of the vehicle, the license plate number and the location. Carr heard Gleason broadcast that he was going to attempt to stop the Bronco. At the same time, Gleason radioed the license plate number and Carr ran it through the computer. Just as the computer responded that the Bronco was stolen, Gleason radioed that he had been shot.

Raymond Foltz, special agent with the FBI, testified that he and Deputy Gleason were on a two-week stakeout prior to the instant bank robbery. He discussed with Gleason the fact that a "switch car" was often used in bank robberies. Gleason was also told that black suspects would usually head back to the Detroit area.

Deputy Sheriff Gleason testified as to his part in the apprehension of the defendants. He stated that in his experience there were two locations where black suspects would attempt to go: (1) the South Park area, where most blacks in Port Huron live; and (2) the Detroit/Mount Clemens area, via I-94. Gleason got to the I-94 location within four or five minutes. He knew it took approximately ten to fifteen minutes to get there from the bank. Because of his conversations with Foltz, he was not looking for the described vehicle, but was looking for a member or members of the black race. Traffic was light at that time. It would be rare to see blacks on that section of I-94 at that time of day. Fifteen to twenty vehicles passed before Gleason spotted the Bronco with a black driver. The Bronco was the first vehicle he saw with blacks in

it. The Bronco was traveling between fifty and sixty miles per hour. Gleason stated:

> I made up my mind I was going to stop the first black person that went by me, due to my previous experience with Agent Foltz and our detectives.

On cross-examination, Gleason testified that he had decided to stop any black person who drove past him. It did not make any difference how many blacks were in the car. *Race was his criteria for making the stops because that was the description of the robbers.*

On redirect examination Gleason stated that he intended to stop vehicles with blacks in them only within twenty minutes; the time frame it would take to drive from the bank to this location. The described vehicle and number of people had no bearing on what vehicle he would stop because he did not know how many people were in the getaway car.

The trial judge held that, looking at the entire circumstances, this was a permissible stop and the elements of probable cause were met by the testimony.

Trial commenced on May 29, 1985. During a break in the voir dire, defendant Muhammad renewed his motion to sever trial. Muhammad argued that codefendant Fowler's statements alleged antagonistic defenses. The trial judge held that, until such time as he was satisfied that there were antagonistic defenses, the trial would proceed with both defendants.

Defendant Muhammad also alleged that, by his peremptory challenges, the prosecutor had excluded blacks from the jury. Of the prosecutor's five peremptory challenges, three were blacks, leaving one elderly black man on the jury. Defen-

dant argues that this was an improper use of peremptory challenges requiring a discharge of the jury. For the record, the prosecutor stated his reasons as to why he preempted each potential black juror. Following this explanation, the trial judge ruled that the peremptory challenges were exercised properly.

Following the people's proofs, defendants moved for a directed verdict with regard to the charge of breaking and entering with intent to commit larceny, assault with intent to commit murder, and the two felony-firearm counts. The trial judge held that two separate felonies were committed, one at the bank and one on the highway. Therefore, the two felony-firearm counts would stand. The trial judge dismissed the count of breaking and entering with intent to commit larceny.

On appeal, Muhammad raises seven issues and Fowler raises three issues. We will consolidate the issues where possible.

Defendants claim the trial judge erred when he denied their motions to quash the warrants, complaint and information and to suppress the evidence obtained following the stop of the motor vehicle in which the defendants were riding because the basis of the stop was the race of the driver.

An evidentiary hearing relative to the vehicle stop made by Deputy Gleason was held on May 23, 1985. The judge held that there were reasons beyond a mere "hunch" or suspicion for the stop. The judge stated that it is necessary to look at the entire circumstances surrounding the case. The officer's statements that he would stop the first black who was going by does not tell the whole story. The police officer had additional information, other than race, which affected his decision. The judge held that the testimony clearly indi-

cated a permissible stop and met the elements of probable cause.

A trial court's ruling on a motion to suppress evidence will not be reversed on appeal unless clearly erroneous. *People v Grimmett,* 97 Mich App 212; 293 NW2d 768 (1980). If upon its review of the record this Court does not possess a definite and firm conviction that the trial court made a mistake, it must affirm. *People v Toodle,* 155 Mich App 539; 400 NW2d 670 (1986).

Taking into account the totality of the circumstances, we believe that Deputy Gleason had a particularized and objective basis for suspecting the driver of the Bronco. His assessment was based on his objective observation, information from police radio reports and consideration of the modes and patterns of operation of bank robbers. He was a trained officer whose inferences and deductions might well elude an untrained person. He based his decision to stop the Bronco on the probabilities. His assessment of the totality of the circumstances led to the suspicion that the individual driving the Bronco may have been involved in the robbery of the bank. This was more than merely observing a black male driving on a highway where predominantly white drivers would be found or recalling that a bank had been robbed a month earlier. Deputy Gleason had an individualized, articulable suspicion. The facts and other circumstances existing immediately prior to the stop supported the reasonableness of Deputy Gleason's decision to investigate.

Next, the defendants claim that the trial court erred when it denied defendant Muhammad's motion to sever the trials for the reason that there were antagonistic defenses. We believe that the trial judge abused his discretion in denying defendant Muhammad's motion to sever the trial. He

had notice of possible antagonistic defenses prior to trial, and after a separate record was made during trial the inconsistencies between the defenses became readily apparent.

A severance should be granted when the defenses of several defendants jointly indicted are antagonistic towards each other. When one defendant accuses the other, thus making it impossible for the defendant asking for a severance to have a fair trial, the severance should be granted. *People v Hurst,* 396 Mich 1; 238 NW2d 6 (1976). Moreover, even when defendants do not directly accuse one another of being the guilty party, the court should order separate trials if the proofs, combined with the defense theories, pit the defendants against each other. Any set of circumstances which is sufficient to deprive a defendant of a fair trial if tried jointly with another is sufficient to require a separate trial.

When the court is put on notice of a potential conflict between the defendants and this conflict becomes clearly apparent as the defendants present their cases, it is error for the trial court not to grant a defendant's motion to sever the trials. *People v Webb,* 82 Mich App 182; 266 NW2d 483 (1978).

Following the people's proofs, defendant Fowler was called to testify. The jury was removed. Defendant Muhammad renewed his motion to sever the trial. A separate record was made. By separate record Fowler testified that he and Muhammad planned and executed the robbery together. Muhammad drove the Bronco and fired the first shots at the deputy. Fowler also emptied his revolver at the police vehicle. Fowler might have hit the car or shot into a window. The trial judge held that the special record did not reach the standards set forth in *Hurst,* in that Fowler was not trying to

exculpate himself and incriminate Muhammad. Muhammad's counsel requested an opportunity to elaborate on the antagonistic defenses. Muhammad's counsel stated that Muhammad would testify that there were two other participants who were involved, that Muhammad did not know of the intent to rob a bank, that he stayed with the Bronco and did not participate in the robbery, that he never shot a gun at all on the freeway and that the other two participants ran away from the scene of the shooting. We believe that the testimony of the defendants clearly pitted them against each other, even though they did not directly accuse each other. The conflict was clearly apparent at this time and the trials should have been severed.

Defendant Muhammad claims his due process rights to trial by an impartial jury were denied when the trial court refused his motion for a change of venue. Denial of a motion for a change of venue was within the trial court's discretion and its discretion will not be reversed unless there has been abuse of such discretion. *People v Swift,* 172 Mich 473; 138 NW 662 (1912). It is appropriate for the trial court to reserve a decision on a request for a change of venue until jury selection has been attempted in the original county.

The existence of pretrial publicity does not by itself require a change of venue. A change of venue is not necessary even though jurors have been exposed to adverse publicity and hold preconceived notions of guilt or innocence if they can lay aside their impressions or opinions and render a verdict based upon the evidence presented in court. *Irvin v Dowd,* 366 US 717; 81 S Ct 1639; 6 L Ed 2d 751 (1961). During the voir dire the trial judge dismissed twenty-two jurors for cause when they indicated they could not be fair and impar-

tial. At the conclusion of the voir dire, the trial judge stated that there had been open and full questioning of the jurors by both defense counsel and that the jury represented a fair cross section of the community and was fair and impartial. He denied the motion for a change of venue.

We believe the trial judge did not abuse his discretion in denying defendants' motion for a change of venue.

Next, defendants claim that they were denied due process because the prosecutor, in exercising his peremptory challenges, excluded black persons from the jury. As previously stated, the prosecutor, out of five peremptory challenges, excluded three blacks, leaving one elderly black on the jury. However, the prosecutor stated on the record his reasons for such challenges. He excused Mrs. Ashford on the basis of her answers and her conduct. Her attitude was not consistent with what he conceived to be a good juror. He also noticed some kind of communication between Mrs. Ashford and one of the defendants. He excused Mrs. Kidd because, when he first asked her if she had driven home with Mrs. Ashford, Mrs. Kidd said no and then later changed her answer to yes. The prosecutor did not feel comfortable with her answers. The prosecutor excused Mr. Ward after finding out that he had been arrested for a criminal charge, a sufficient basis for the use of a peremptory challenge. None of his peremptory challenges were racially motivated.

The trial judge ruled that, relying on the record, the peremptory challenges were exercised properly. We agree.

Also, defendant Muhammad claims the trial court committed error by allowing him to be charged and convicted of two counts under the felony-firearm statute, because he claims the

charges against him arose out of a single transaction.

The trial judge ruled that in the instant case there were two sets of felonies committed on two separate occasions. One felony was at the bank and the other on the highway. We agree that there was no error in charging the defendants with two separate felonies.

Next, defendant Muhammad claims he was denied due process and a fair trial because the trial court failed to rule prior to trial that all the elements necessary to support the charges of breaking and entering with intent to commit larceny had not been established, thereby allowing witnesses to testify regarding the alleged crime and thereby prejudicing the jury with respect to defendant.

All of the elements of breaking and entering with intent to commit larceny were established at both the preliminary examination and at trial. It was error for the trial judge to dismiss this count. However, it was harmless error. MCL 750.110; MSA 28.305 states:

> Any person who shall break and enter with intent to commit any felony, or any larceny therein, any tent, hotel, office, store, shop, warehouse, barn, granary, factory or other building, structure, boat or ship, railroad car or any private apartment in any such buildings or any unoccupied dwelling house, shall be guilty of a felony punishable by imprisonment in the state prison not more than 10 years. Any person who breaks and enters any occupied dwelling house, with intent to commit any felony or larceny therein, shall be guilty of a felony punishable by imprisonment in the state prison for not more than 15 years. For the purpose of this section "any occupied dwelling house" includes one that does not require the physical presence of an occupant at the time of the

breaking and entering but one which is habitually used as a place of abode.

Delores Cook testified that she was at her mother's house, 815 Range Road, when two men burst into the unlocked house. One man asked her, "Where's the keys" and she stated that she did not have the keys. The two men went outside, Cook locked the door, and the men broke the chain, lock, and casing on the door and reentered the house. The men ran out again and were captured by the police in the field behind the house. It may be inferred that one of the defendants was asking Delores Cook for keys for the purpose of taking a vehicle from the occupant of the dwelling. The fact that there were no keys or vehicle at the house does not negate the element of intent. We believe the trial judge erred in dismissing the count of breaking and entering with intent to commit larceny. The fact that the trial judge improperly dismissed this count should not inure to defendant's benefit and be the cause of a new trial.

Next, defendant Muhammad claims the trial court erred by denying his motion for a new trial on the basis that his right to counsel had been compromised. On March 10, 1987, an evidentiary hearing was held before the trial court relating to the assertion that defendant's attorney-client conferences were electronically monitored while he was incarcerated in the St. Clair County Jail.

Michael Bloomfield, assigned as corporal in the St. Clair County Jail on December 13, 1985, testified that he was notified on December 17, 1985, by attorney David Dean that there was a speaker device in the "blue room" (the conference room for attorney-client meetings at the jail). Dean did not indicate that he thought the police were actually listening over the instrument, but wanted to know

whether there was the capability to listen into the blue room. Bloomfield indicated to Dean that he had no knowledge of ever having the ability to listen or speak into that room by any kind of speaker system. Bloomfield requested to be shown the speaker. It was on the wall behind a face plate. Bloomfield had to get up on a table in order to see the speaker.

Bloomfield believed that the speaker in the blue room was inoperable and had no knowledge that it was ever used to listen or to speak into that room. The speaker system in the jail goes to certain cell block areas. Visiting rooms do not have the same capabilities. You cannot speak into them or hear what is going on in them. The main control console which operates the public address system has no switch which controls any speaker in the blue room.

Bloomfield was trained in the use of this equipment when he became jail supervisor. He has full knowledge of the operating of the console and has used it everyday for the last year. There was no evidence to support defendant's contention that the conversations in the blue room had been monitored or that defendant's Sixth Amendment right to counsel had been infringed. We affirm the trial judge's order.

The last issue raised in this case is by defendant Fowler, who claims his sentence should be vacated and the case remanded for resentencing because his sentence was excessive under the facts of the case and because the trial court failed to articulate sufficient reasons for imposition of the sentence. In *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983), our Supreme Court held that an appellate court, in reviewing a trial court's exercise of discretion in sentencing, may afford relief to a defendant only if the appellate court finds that the trial

court, in imposing the sentence, abused its discretion to the extent that it shocks the conscience of the appellate court.

On August 6, 1985, defendant Fowler was convicted of being a second felony offender. Defendant had been previously convicted of armed bank robbery in the State of California.

The crime of armed robbery carries with it the punishment of imprisonment in the state prison for life or for any term of years. MCL 750.529; MSA 28.797. Defendant's sentence of life does not shock the conscience of this Court.

Defendant also contends that the trial judge did not sufficiently articulate his reasons for the imposition of sentence. In announcing his decision to impose a life sentence on the bank robbery conviction the trial judge stated:

> Let me state on the record, first of all, that I'm very familiar with all of the aspects of this case, having heard same, and the jury has made their final determination as to the guilt of this defendant and, of course, bank robbery carries with it a maximum life sentence and in addition thereto there is certainly, let's put it this way, all of the aggravated circumstances that could be present were present in this case and I want to tell you, Mr. Fowler, I was impressed with your statement that you made, it indicates, of course, you do not lack in education, you, obviously, have a good education and by the same token you must have been aware of what you were doing at the time you did these actions and I'm going to pass sentence at this time.
>
> It is the judgment of this court that you be committed to the Michigan Corrections Commission at the State Prison for Southern Michigan, Township of Blackman [sic], County of Jackson, to be confined in such penal institution of the state as it shall direct for life with no credit for time served.

Perhaps the trial judge's statement that "all of the aggravated circumstances that could be present were present" is not sufficient to satisfy the mandates of *Coles.* Panels of this Court have remedied the absence of articulation by remand to the sentencing judge so that reasons may be placed on the record. *People v Cannoy,* 136 Mich App 451; 357 NW2d 67 (1984).

However, in *People v Willhite,* 155 Mich App 124; 399 NW2d 57 (1986), this Court did not remand for a more specific statement where the sentence fell within the guidelines and did not shock the judicial conscience. The panel held that a specific statement by the trial court of its reasons would in no way aid this Court in reviewing the defendant's sentence.

We do not believe that a remand for the trial court to more specifically articulate its reasons for the sentence would assist us in review. Therefore, we declare the error harmless.

This case as to defendant Fowler is affirmed. As to defendant Muhammad, the case is reversed and remanded for a new trial.

CYNAR, J., concurred in the result only.

HOOD, P.J. *(concurring).* I concur with the result reached by the majority, but write separately to express respectful difference as to the conclusions reached on two issues.

First, I do not feel that Deputy Gleason had probable cause to stop the Bronco simply because it had a black driver. I agree that it is necessary to examine the totality of the circumstances to determine what cause is sufficient to authorize police to make a stop. *United States v Cortez,* 449 US 411, 418; 101 S Ct 690; 66 L Ed 2d 621 (1981); *People v Martin,* 99 Mich App 570; 297 NW2d 718 (1980), lv den 413 Mich 926 (1982). The totality of circum-

stances in this case, however, demonstrate that the only "particularized suspicion" leading Gleason to stop the Bronco was the sole fact that the driver was black.

The robbery was committed at approximately 11:20 A.M. by two masked black men who escaped in a white or ivory-colored Trans Am or Camaro. Less than fifteen minutes later, Deputy Gleason noticed a black and red Ford Bronco, with one black male, approximately fifty years old, driving and decided to stop it because a black male was driving. Gleason testified that he had decided to stop any black person who drove by him, regardless of the number of persons in the car. Gleason knew nothing about cars being switched or the Bronco being stolen. There is no discernible basis for Gleason's supporting statement that it is rare to see blacks on an interstate freeway in the middle of the day. Being black and driving on a public highway within a short time after a bank robbery does not, in my opinion, justify the arbitrary stop made in this case. The fortuitous fact that the perpetrators turned out to be in the vehicle does not in and of itself justify the result.

Despite the initial illegal stop, however, there was no need for the trial court to suppress the evidence. When the driver of the Bronco came out of the vehicle firing a weapon at the deputy, the fact of the illegal stop became irrelevant, and deputy Gleason certainly had probable cause to pursue the Bronco and apprehend its occupants.

I am also not prepared, based on the record, to make a conclusion that none of the prosecutor's peremptory challenges were racially motivated. The trial court did not clearly err, however, since the prosecution did put forth racially neutral explanations for challenging the black jurors.

Except as indicated herein, I agree with all the conclusions of the majority opinion.